UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

CARL ORLANDO, JR., et al.,

                    Plaintiffs,

           v.                          15 CV 9434 (RJS)

LIBERTY ASHES, INC., et al.,
                                       Conference
                    Defendants.

------------------------------x

                                       New York, N.Y.
                                       April 25, 2018
                                       3:45 p.m.

Before:

          HON. RICHARD J. SULLIVAN

                                       District Judge




          APPEARANCES

JOSEPH & KIRSCHENBAUM LLP
     Attorneys for Plaintiffs
BY:  DENISE A. SCHULMAN


FINN W. DUSENBERY
     Attorney for Plaintiffs


TRIVELLA & FORTE LLP
     Attorneys for Defendants
BY:  CHRISTOPHER SMITH
     JONATHAN M. BARDAVID

1          (Case called)

2          THE COURT:  Good afternoon.

3          We are here in connection with defendants' motion to

4   compel arbitration.  This is kind of a renewed motion.  We have

5   gone around the block a little bit on this thing.  There is

6   another case that is sort of relevant in which I addressed a

7   similar issue, and that was Raymond v. Mid Bronx Haulage, which

8   I think the parties have seen.  I have read the letters of the

9   parties, the pre-motion letters.  They are dated April 11th and

10  April 16th.

11         It seems to me that the first issue to address is

12  whether or not the collective bargaining agreement applies to

13  former employees of Liberty Ashes.  If the answer to that is

14  no, that would pretty much resolve the motion.  If the answer

15  is yes, then there are still other arguments that we would have

16  to address, including whether or not Orlando and Acevedo, who

17  are plaintiffs, were ever members of the union; whether Menna,

18  Persad, and Powell, who were members of the union, ceased to be

19  union members prior to the amendment or revised collective

20  bargaining agreement.  Then finally there will be an issue as

21  to whether the arbitration clause is enforceable or severable.

22  We may get there, we may not get there.

23         That is the way I had figured we would deal with this.

24  Does that sound logical to you folks?

25         MS. SCHULMAN:  Yes.

1           MR. SMITH:  Yes, your Honor.

2           THE COURT:  Let's start with that first issue.  It

3      seems to me that this agreement is a little different than the

4      agreement in the <u>Mid Bronx Haulage</u> case.  Here we had certain

5      employees of the defendant Liberty Ashes who were represented

6      by Local 890.  There is a series of collective bargaining

7      agreements which get extended and renewed over time.  The

8      relevant one I think is January 2012 to December 31, 2015.

9      Then there is a successor CBA which maintains for the most part

10     the terms of the expired CBA, and that is from January 1, 2016,

11     through December 31, 2018.

12          On December 28, 2016, in exchange for a wage increase

13     and some other things, the union agreed to amend the collective

14     bargaining agreement to add an arbitration provision.  That

15     arbitration provision, among other things, says that "All

16     claims accruing at any time brought by either the union or

17     Employees," which is capitalized, "employees" with a capital E,

18     "concerning an employee's hours and wages, including but not

19     limited to claims arising under the Fair Labor Standards Act,

20     shall be subject exclusively to the grievance and arbitration

21     procedures described in the collective bargaining agreement."

22     It also says that there shall be no right or authority for any

23     of the above claims to be arbitrated on a classwide basis.

24          It seems pretty clear that current employees would be

25     covered by this, they would have to arbitrate, and that would

1    apply to all claims accruing at any time.  The issue then is

2    whether or not the plaintiffs here, five plaintiffs who joined

3    in this action, are bound by this agreement.

4          There is a factual assertion that they were not

5    employed by, they were not employees of Liberty Ashes at the

6    time of the amendment and that the amendment itself does not

7    expressly cover former employees.  That is different than the

8    Mid Bronx case, which I think does have different language that

9    supports the conclusion that it applies to former employees.

10         Let's talk about that.  You know my drill with pre-

11   motion conferences.  I think they are useful.  I'm not ruling

12   on the motion unless you want me to construe it made, and then

13   I can, I suppose.  But if you want to brief it further, I

14   certainly will give you the opportunity to do that.

15         I think there are benefits to do it this way.  It

16   allows us to kick the tires and engage in some argument that

17   might resolve the issue or at the very least will give you some

18   insights as to where I think there are close questions or

19   causes for concern.

20         Let me hear from the defendants on this, since it is

21   their motion.  It is undisputed, right, that the five

22   plaintiffs that I mentioned were not employed by Liberty Ashes

23   as of January 1, 2016?

24         MR. SMITH:  That's correct.

25         THE COURT:  Unless that provision applies to former

1   employees, it is binding on them for a cause of action that

2   accrued before the amendment; this wouldn't cover them, right?

3              MR. SMITH:  I think that's fair.

4              THE COURT:  Generally speaking, an arbitration clause

5   has to be pretty clear on its face.  It seems to me that there

6   is nothing in the language here that would suggest that this

7   was intended to apply to former employees.

8              MR. SMITH:  If you look on the second line, it's got

9   the words "accruing at any time," your Honor.  We would submit

10  that that certainly covers it.  It also says all claims.

11             THE COURT:  All claims of employees.  "Employees" is

12  not defined.  The issue is are people who are no longer

13  employees bound by this?  Was there an intention to bind them?

14  Did they have an opportunity to consent?  Was the union even

15  authorized to do this, and even if they were, did they do it?

16             MR. SMITH:  Our position is yes, the union was

17  authorized with respect to all the individuals to bargain on

18  their behalf.

19             THE COURT:  Employees, as I noted before in the

20  provision I just read -- this is from your pre-motion letter.

21  Do I actually have the agreement someplace, the amendment?  I

22  am looking at it here.  The term "employee" is not defined,

23  right?  Am I wrong about that?

24             MR. SMITH:  Not there it is not defined.

25             THE COURT:  Is it defined someplace else?

1          MR. SMITH:  I believe in the collective bargaining

2    agreement it's got a union shop clause that indicates which

3    individuals are covered by the collective bargaining agreement.

4    I think it is fair to interpret the agreement to basically say

5    anybody who was or is in the unit or who may actually come into

6    the unit --

7          THE COURT:  It certainly covers future.

8          MR. SMITH:  Yes, it covers future.  And it covers

9    former employees because the former employees actually

10   expressly signed authorization cards.

11         THE COURT:  They didn't sign after January 1st of

12   2016, right?  The amendment is December 28, 2016.

13         MR. SMITH:  Yes.

14         THE COURT:  That is not something that was ratified by

15   any of the plaintiffs here who were former employees, right?

16         MR. SMITH:  They signed previously.  They never

17   revoked their signature and their authorization of the union to

18   act as their exclusive bargaining representative.  There is

19   specific language on the authorization cards that states, "This

20   authorization may be revoked by me as of the anniversary date

21   hereof by written notice of such revocation signed by me and

22   given to my employer and the union by certified mail to my

23   employer not less than 30 days and no more than 60 days before

24   such anniversary date."

25         In this authorization card it also said behalf that,

1  in the first paragraph, it says, "I, the undersigned, hereby

2  apply for member in the above union," the union here being the

3  League of International Federated Employees.  "I authorize it

4  to represent me for the purpose of collective bargaining, and I

5  authorize and irrevocably direct my employer to deduct from my

6  wages initiation fees," etc."

7          That is certainly an authorization for the union to

8  act on behalf of them until they provide this written

9  cancellation of that authorization.  So there is an express

10 agency.

11         THE COURT:  We are going to get there in a minute.

12 I'm talking about are they covered as an employee?  Not all

13 union members are employees, right?

14         MR. SMITH:  Well --

15         THE COURT:  Let me put it this way.  Somebody who

16 never worked for these guys who is in the union, then the union

17 negotiates an agreement like this, you are saying they are

18 going to be bound by an arbitration clause even if they were

19 never employed?

20         MR. SMITH:  No.  They never worked for Liberty.

21         THE COURT:  If they are not employed by Liberty at the

22 time of the amendment, what in the language of the amendment

23 suggests that they are still covered as employees?

24         MR. SMITH:  It will be accruing at any time.

25         THE COURT:  If I'm a current employee and I've got

1    claims that accrued 3 years ago, I'm then bound by this

2    arbitration clause, no question about that.  I don't see how

3    that language, though, provides any guidance one way or the

4    other as to whether or not former employees are in the same

5    boat as current employees.

6          MR. SMITH:  If you read that language in conjunction

7    with the language on the authorization card, which is a

8    contract, the authorization car said LIFE is my agent for

9    purposes of collective bargaining, the collective bargaining

10   relates to my terms and conditions of employment at any time.

11         Once they sign that and once they say if I'm going to

12   withdraw that authorization, I'll make sure that I send you a

13   certified mailing and I'll do it within a certain time period

14   so that you have proper notice, then I think it is fair and

15   proper for the employer to rely upon that.  In fact, it could

16   potentially be an unfair labor practice if, notwithstanding

17   that agency relationship, the employee would try to negotiate

18   directly with an employer or otherwise engage in collective

19   bargaining.  My understanding of the law is that might be a

20   section 85 violation.

21         Putting all that aside, on January 31st you dismissed

22   our motion without prejudice and with leave to renew and gave

23   us additional time to conduct discovery on two issues: whether

24   they were members of the union and whether they had revoked

25   that membership.  You specifically did that because of your

previous experience with Mid Bronx and your familiarity with

the cases that are on point and the Lai Chan case.  We went

back and did that.

    I think it is pretty specific with respect to Acevedo,

Menna, and Persad that they had signed these cards, that they

had bound themselves and were members of the union, and that

they never revoked in writing or otherwise.  So it is not just

a question of did they meet the specific technical requirements

of a certified mailing.

    I think the deposition testimony of these individuals

will show that they never revoked it at all.  They never sent

any oral communication or any other communication until their

attorneys, after the Mid Bronx case issued, in this case did

send a letter to the union basically saying that we don't think

we are bound but just in case we are bound, paraphrasing now,

we revoke any right of the union to act on our behalf.

    There is a question of fact with respect to Acevedo.

We have a signed authorization card from Mr. Acevedo.  Despite

that, Mr. Acevedo claims that he never joined.  So I guess that

would be a question of fact.

    THE COURT:  Let's stop.  I want to hear from

plaintiffs on this.

    MR. SMITH:  Mid Bronx, it is right on point.  All the

cases, all of the reasoning they used in Mid Bronx is right on

point for this case.

1          THE COURT:  Who is carrying the ball here?  Ms.

2   Schulman?

3          MS. SCHULMAN:  Yes.

4          THE COURT:  Maybe we could start with a point that

5   wasn't really raised until later in the day by the defendants.

6   Is this issue, this one that is properly left to the

7   arbitrators, whether the arbitration clause applies retro-

8   actively to former employees, that is an interpretation issue

9   that is for the arbitrator?

10          MS. SCHULMAN:  No.  I believe the question of who is

11   bound by the arbitration clause is a decision for the Court.

12          THE COURT:  What makes this case different from Mid

13   Bronx?

14          MS. SCHULMAN:  A couple of things.  First of all, in

15   Mid Bronx the arbitration clause, as you stated, already

16   explicitly stated that it applied to past employees.  This one

17   does not.  With respect to the meeting of the capitalized term

18   "employees," I don't believe it is formally defined anywhere.

19   However, if you look at paragraph 5 of the memorandum of

20   agreement, that says all employees, with capital E, will

21   receive a $200 book allowance once per year.  Our clients

22   didn't receive that because they were not employees when this

23   was in effect.

24          A second difference between this case and Raymond is

25   the underlying CBA that was modified by the memorandum of

1    agreement says that it only applies to current and future

2    employees employed during the term of the agreement.

3              THE COURT:  The CBA, not the MOA?

4              MS. SCHULMAN:  Right.  The term of that CBA is January

5    1, 2016, to December 31, 2018.  None of our employees worked

6    during that period, so none of them are covered by the CBA that

7    was modified by the MOA.

8              THE COURT:  I do want to hear Mr. Bardavid respond to

9    that.  The CBA language doesn't say former, right?  It just

10   says current and future.

11             MR. SMITH:  That's what it says.  I don't want to step

12   into the area that the arbitrator would be interpreting the

13   CBA.  He or she will be ultimately the one to decide what the

14   term "employee" means in this context, which employees were

15   covered.  I think the AT&T case says that the court is a

16   gatekeeper to determine whether there was an agreement to

17   arbitrate.

18             But once the Court determines, as we respectfully

19   submit you should here, that there is an arbitration clause

20   that is broad enough to cover the dispute, certainly broad

21   enough here under the Fair Labor Standards Act, then the Court

22   should defer to arbitration under the Steelworkers Trilogy and

23   a number of other cases and leave it to the arbitrator to

24   interpret exactly what the "Employee" capital E means; whether

25   the language "at any time" applies to past, present, former

1   employees.

2          The whole purpose of having arbitration clauses in the

3   labor context and having the presumption of arbitrability is to

4   avoid entwining federal courts with issues that are more

5   properly left to whoever the parties have decided to resolve

6   their dispute.

7          THE COURT:  Issues of arbitrability are for a court to

8   decide unless the parties clearly and unmistakably provide

9   others.  That is the Supreme Court.

10         MR. SMITH:  The language says shall be subject

11  exclusively to the grievance and arbitration procedures

12  described in the plaintiff bargaining agreement.  That is

13  pretty clear.  It specifically refers to the Fair Labor

14  Standards Act pursuant to the gatekeeping function that the

15  federal court provides.  But once there is a determination that

16  there is a clause that is subject to that interpretation, it is

17  our position -- I don't think it is just or position, I think

18  it is the Supreme Court's position -- that the federal court at

19  that point should defer.

20         THE COURT:  What you are saying is if there is clearly

21  an arbitration clause, that is enforceable.  The issue is

22  whether it applies to past employees as well as current and

23  future employees.  You're saying that that determination, that

24  issue, is for the arbitrator?

25         MR. SMITH:  Yes.  It requires a specific inter-

1    pretation of the CBA.  Normally, federal courts don't get

2    involved in that.

3              THE COURT:  No, no.  It is for the Court to decide

4    unless the parties clearly and unmistakably provide otherwise,

5    right?

6              MR. SMITH:  Unless the Court determines that there is

7    an arbitration clause whose parameters cover the disputed

8    issue.

9              THE COURT:  I'm still not sure whether you are saying

10   that that is proper for the arbitrator to decide or for the

11   Court to decide.

12             Maybe we should chat about the secondary issues.  If

13   there is no dispute on those, then the whole thing may go away.

14   Is there a dispute as to whether Orlando and Acevedo were

15   members?  Plaintiffs say they were not.

16             MR. SMITH:  There is a dispute.  My understanding is

17   Orlando only worked three months at Liberty Ashes.  When the

18   union was deposed, I believe the union's testimony was that

19   they had no records of Orlando being a member.  Our position is

20   that he was a part of the union, he should be bound by the

21   terms.  But ultimately that will be for the Court to decide.

22             THE COURT:  This is maybe a question for the

23   plaintiffs.  Is it the case that there are some employees of

24   Liberty Ashes who are not union members?  Is it a mixed shop?

25             MS. SCHULMAN:  It is not a mixed shop, but they do not

1   seem to be as conscientious as some other places about ensuring

2   that all employees actually join the union when they are

3   supposed to.  For example, Quamaine Powell, another one of our

4   plaintiffs, didn't join the union until many, many months into

5   his employment.  It was really towards the end of his employ-

6   ment that he finally became a union member.  So it seems like

7   they are not really on top of enforcing the closed shop policy.

8           THE COURT:  That's pretty convenient.  You get to be a

9   union member when it suits you and you get to say I'm not when

10  it doesn't suit you.

11          MR. SMITH:  Mr. Orlando never signed a union

12  application.  He never signed a checkoff authorization.  He

13  never paid an initiation fee.  The union never billed the

14  company for his dues.  He wasn't a union member.

15          THE COURT:  You're saying that Liberty Ashes hired him

16  without properly making sure he was a union member or the union

17  just turned a blind eye and decided to allow nonunion workers

18  to work at the employer?

19          MS. SCHULMAN:  I don't know how it played out in

20  reality.  I believe under the contract new hires are supposed

21  to join the union within 30 days.  I don't know if Liberty

22  didn't inform the union that they had a new employee, if the

23  union knew that there was a new employee but didn't follow up

24  in obtaining his membership.  I don't know answer to that.

25          THE COURT:  Do you dispute that?

1              MR. SMITH:  Your Honor, I think it is a red herring

2    issue.  Whether or not he actually joined the union, whether he

3    paid his dues, whether he remained a member in good standing is

4    really beside the point.  The fact of the matter is I don't

5    think it is disputed he signed a authorization card.

6              We are talking about Acevedo?  I'm sorry.  If we are

7    talking about Orlando, he is just part of the union.  But we

8    haven't through discovery determined any union membership

9    indication at this point.  That is probably subject to --

10             MS. SCHULMAN:  The union representative testified that

11   he was never a member of the union.

12             MR. SMITH:  At the end of the day, he still was

13   covered by the CBA, our position is, your Honor.

14             THE COURT:  So even though he is not a member of the

15   union, he is bound by the CBA?

16             MR. SMITH:  Yes.

17             THE COURT:  Why is that?

18             MR. SMITH:  I think that is section 7 under the

19   National Labor Relations Act, he is bound by a collective

20   bargaining agreement.  He can't just jump out.  There is a

21   union shop clause that says you have to join.  He can't on his

22   own negotiate his terms and conditions of employment.  We are

23   talking about Orlando now.

24             THE COURT:  That seems like then it is the employer

25   who is using the union card when it suits them and not

1   otherwise.

2           MR. SMITH:  It is not a question of the employer using

3   a union card.  There is a collective bargaining agreement unit

4   that has been established, so any members of that unit are

5   bound to whatever is negotiated on a collective basis.  They

6   decided to engage in concerted activity; that is one of the

7   results of that.

8           THE COURT:  But your client was bound to not hire

9   somebody who was not a union member, right?

10          MR. SMITH:  The employer is bound to, for instance,

11  pay his wages under the CBA whether or not he is a union

12  member.  If he is working there --

13          THE COURT:  You're telling me it's not a breach to

14  hire a nonunion person?

15          MR. SMITH:  Yes.  In fact, there is no closed shop

16  anymore.  If somebody wants to hire a nonunion person subject

17  to them joining, you can have a union shop clause that says

18  within 90 days an individual must join the union.  That is

19  legal.  But the union can't say in conjunction with the

20  employer we have a closed shop here, only union members need

21  apply.  That was outlawed years ago.

22          THE COURT:  Orlando was an employee at one point,

23  right?

24          MR. SMITH:  Not only that, but he was a member of the

25  collective bargaining unit.  He was in the collective

1  bargaining unit, which is the individuals, the helpers, and the

2  individuals who worked on garbage trucks.  He was part of that

3  unit.  That unit has been in existence for over a decade.

4  Being part of that unit, he is going to be bound.  He can

5  enforce the collective bargaining agreement in his favor, but

6  he can also be held to it if the need arises because he is part

7  of that union.

8         He is not acing alone once he joins and becomes part

9  of a collective bargaining unit.  He is acting --

10        THE COURT:  Joins to become part of a collecting

11 bargaining unit meaning he becomes just an employee of Liberty

12 Ashes?

13        MR. SMITH:  In that particular unit that is covered by

14 the collective bargaining agreement, that's right.  If he

15 became an employee that worked in the office as a secretary,

16 no, he would be an employee of Liberty Ashes but he wouldn't be

17 bound to the terms and conditions and Liberty wouldn't be bound

18 to pay him pursuant to the collective bargaining agreement.

19        There is a jurisdiction clause in the collective

20 bargaining agreement that covers certain points.  It certainly

21 covered Orlando while he worked there.  Our position would be

22 he is covered by the agreement unless the agreement says he is

23 not.  Whether or not he was a probationary employee or somebody

24 else who may or may not have been covered, that is within the

25 exclusive province of the arbitrator to decide.

1              THE COURT:  What about Acevedo?

2              MR. SMITH:  For Acevedo we have a card.  It's dated

3    June 17, 2010.  We took his deposition.  He admitted that that

4    was his signature.  The card has the specific language that I

5    stated earlier today about exclusive authorization of the union

6    to engage in collective bargaining on his behalf and also the

7    requirement that he provide written notice both to the union

8    and to the employer if he was going to revoke that agency

9    authority.  So there was express, apparent authority, actual

10   authority for LIFE to act on his behalf.

11             THE COURT:  Does that matter?  It would seem to me

12   that the arguments you made for Orlando would also apply to

13   Acevedo, and you just told me it doesn't matter for Orlando,

14   right?

15             MR. SMITH:  I think it matters with respect to the

16   revocation issue.  One of the things you wanted us to explore

17   when you issued order on January 31st is did they ever revoke

18   the authority of the union to act on their behalf.  For

19   instance, if it turned out -- this is just complete

20   speculation, this doesn't exist in this case -- but if it had

21   turned out that employee A had said, I went to the employer and

22   the union and I sent a certified letter on such and such a date

23   revoking my membership in the union or otherwise revoking the

24   union to act on my behalf to collectively bargain with the

25   employer, that would certainly be relevant to your deter-

1  mination whether he was covered in the collective bargaining

2  unit and covered by the collective bargaining agreement.  We

3  don't have that here, especially with respect to an individual

4  who specifically signs a card and indicates in his deposition

5  that he read it before he signed it.

6          THE COURT:  Indicates what?

7          MR. SMITH:  That that was his signature.  I don't want

8  to quote.  I have the transcript from the deposition.  So I

9  don't want to say exactly what he said.  I'm paraphrasing.  He

10  certainly said that was his signature.  He didn't recall

11  exactly when the signature was affixed, but he gave no

12  indication that he hadn't signed that card.  So it doesn't

13  really matter what happens.  Once he signs that card, it does

14  not matter whether it gets delivered to the union.

15          THE COURT:  You just told me a minute ago it didn't

16  matter whether he signs a card at all, right, for Mr. Orlando?

17          MR. SMITH:  Our position is yes, because he is part of

18  the bargaining unit, that it shouldn't matter.

19          THE COURT:  Wouldn't the same be true for Acevedo?

20          MR. SMITH:  For Acevedo there is an express agency

21  relationship that he has established in writing and that the

22  employer relied upon to its detriment to negotiate with the

23  union on his behalf.

24          THE COURT:  You win if he has that and you win if he

25  doesn't have that, is what you are saying to me?

1            MR. SMITH:  I think it is in the alternative.  I think

2   you could find that because they are members of the collective

3   bargaining unit, under section 7 of the National Labor

4   Relations Act they are engaged in concerted activity and the

5   union is the bargaining representative; therefore, if the union

6   negotiates something at arm's length with the employer, they

7   should be bound.

8            If the Court is not willing to place those parameters

9   on binding an individual, then you have an alternative argument

10  that the Court could certainly buy into where an individual

11  specifically agrees with the employer as a term and condition

12  of his employment that he is joining LIFE, he is agreeing that

13  it is the exclusive bargaining representative for all purposes,

14  and that if he decides he is going to revoke that, he will

15  certainly give the employer and the union both within a certain

16  specific time period certified mail.

17           Particularly where an individual says that he never

18  communicated with the union to revoke their authority, he never

19  communicated with the employer to revoke their authority, then

20  yes, I think that is an easier case for the Court to decide.

21           THE COURT:  Then we have the three other plaintiffs,

22  Menna, Persad, and Powell.  They are claiming that they ceased

23  to be union members, Ms. Schulman?

24           MS. SCHULMAN:  Yes.  Do you want me to speak to

25  Acevedo or move on to the other three?

1          THE COURT:  Answer that factual question first.

2          MS. SCHULMAN:  The union representative testified that

3   the termination date listed in those three individuals' records

4   indicate the date that their union membership terminated.

5          THE COURT:  Their union membership terminated?

6          MS. SCHULMAN:  That was the testimony, yes.

7          THE COURT:  Because they ceased to be employees or

8   because they affirmatively withdrew from the union?

9          MS. SCHULMAN:  I believe it is because they ceased to

10  be employees.  The transcript did not come out quite as clearly

11  as I had expected it to.

12         THE COURT:  I'm not sure it is enough to be that they

13  ceased to be employees.

14         MS. SCHULMAN:  There actually is some case law from

15  the Sixth Circuit that it is the union's policy that membership

16  terminates when employment terminates as long as it is not

17  directly contrary to something in the Constitution or bylaws,

18  that is acceptable.

19         THE COURT:  So I'm a member of the union for my whole

20  life, and then I'm between jobs, and I cease to be a member of

21  the union?  That's what you are saying?

22         MS. SCHULMAN:  If it is the union's actual policy and

23  it doesn't conflict.

24         THE COURT:  Where does that policy appear?  I'd be

25  shocked.

1          MS. SCHULMAN:  The Constitution is not completely

2    clear about how union membership ends.  It has some provisions

3    for expulsion if your dues are late or in arrears.  Then it has

4    a sentence that says any member who has permitted his or her

5    membership in the union or in any local to terminate for any

6    reason, and then it goes on from there.

7          It leaves open the possibility that there is a way for

8    an individual to allow membership to terminate.  I think if the

9    union's policy is that it terminates when employment

10   terminates, that is not inconsistent with the language of the

11   Constitution.

12         THE COURT:  Do you want to respond to that, Mr.

13   Bardavid?

14         MR. BARDAVID:  That is actually Mr. Smith, I'm Mr.

15   Bardavid.

16         THE COURT:  I'm sorry.  You're Bardavid.  He's Smith.

17   Sorry.

18         MR. BARDAVID:  That's okay.  If I could address that,

19   your Honor, especially since I litigated Mid Bronx?

20         THE COURT:  Yes.

21         MR. BARDAVID:  It is not surprising that is what the

22   union would say.  It is what the union said in Mid Bronx too,

23   which is he ceased being an employee, therefore they are not a

24   member.  But we go back to the documents.

25         THE COURT:  That's what we did, went back to the

1    documents.  I don't have those documents now.

2              MR. BARDAVID:  We will submit --

3              THE COURT:  It's the same union?

4              MR. BARDAVID:  No, it's a different union.  What we

5    have here in addition to the constitution is, as my colleague

6    Mr. Smith did mention, we do have the union cards, the

7    membership cards.  They contain a specific provision similar to

8    that in Mid Bronx, which is if you want to revoke the authority

9    of the union acting on your behalf, you have to notify your

10   employer and the union by certified mail and all the steps that

11   need to be followed.

12             I think there is really no dispute that those steps

13   were not followed.  For those individuals, we say for the four

14   who signed cards, you have to go back to the documents.  We

15   will present those documents and we believe it will be the same

16   situation.  What the union thought and what their policy is is

17   immaterial to what the document actually says.

18             MR. SMITH:  I would add, your Honor, I think the whole

19   issue of membership is sort of a red herring issue again.  Once

20   they establish the agency relationship with the union, i.e.

21   with the cards and make that representation to the employer,

22   then any secret arrangements between the union and member --

23             For instance, let's say the member had failed to

24   maintain his dues and the union expelled him for that reason.

25   I don't think that would have any bearing at all on whether or

1    not the union was still authorized to act as his agent.

2    Particularly where, as here, you have an employer who was

3    relying on that representation of apparent and actual authority

4    and making decisions as to wages --

5              THE COURT:  I don't know.  They could have easily

6    spelled this out in the agreement.  They didn't, right?  They

7    didn't define the term "employee" and they didn't say this

8    includes current, future, and former employees.  They could

9    have but they didn't, right?

10             MR. SMITH:  I guess that's why you have arbitrators.

11   No matter how well you draft things, you can't address every

12   single situation.  That's why you have arbitrators.

13             THE COURT:  Your principal point, I think, is that the

14   issue as to whether or not the CBA applies to former employees

15   is an issue for the arbitrator.  That is your first argument,

16   right?

17             MR. SMITH:  Yes, your Honor.  Any issue requiring

18   interpretation of the CBA, our position would be it should go

19   to the arbitrator.

20             THE COURT:  Your next point is even if it is for the

21   Court to decide, the language of the CBA -- it's a new CBA or

22   it's a memo of understanding?

23             MS. SCHULMAN:  The arbitration clause --

24             THE COURT:  The December 28, 2016.

25             MS. SCHULMAN:  Is a memorandum of agreement.

1          THE COURT:  I guess the next issue is whether that

2    applies to former employees as well as current and future

3    employees.  The principal argument there is because it says

4    claims arising under the Fair Labor Standards Act and claims

5    accruing at any time -- that's what you are saying, right, Mr.

6    Smith?

7          MR. SMITH:  That's right, your Honor.

8          THE COURT:  I think the question whether or not that

9    is for the arbitrator or for the Court is an interesting one.

10         The other issues about whether or not Orlando and

11   Acevedo were members of the union, whether or not Menna,

12   Persad, and Powell ceased to be members of the union, that is

13   going to require us to get into the weeds quite a bit.  But I

14   guess we are going to need to do that.

15         I am going to need to see the Constitution and other

16   documents which would be binding, and also whatever the other

17   discovery there was to indicate what the relationship was

18   between those employees and the employer.  I guess we are going

19   to have to brief this.  How long do you think you will need to

20   do that?

21         MR. SMITH:  It depends how you want to handle it, your

22   Honor.  You had previously dismissed our prior motion on the

23   docket with leave to renew.  Do you want us to refile all brand

24   new papers, including all arguments that were previously on the

25   docket, or do just want us to supplement that last?

1           THE COURT:  However you think is the best way to do

2      it.  I think there is a little more clarity now.

3           MR. SMITH:  We will take 30 days and to it from

4      scratch.  I think it would be best to do it that way.

5           THE COURT:  30 days puts us at May 25th or so.  That's

6      a Friday, May 25th.  How long to respond, Ms. Schulman?

7           MS. SCHULMAN:  Same amount of time.

8           THE COURT:  That's June 25th.  Then July 6th or July

9      2nd, what do you prefer for a reply?

10          MR. SMITH:  Could we do the 9th?

11          THE COURT:  Are you okay with that, Ms. Schulman?  It

12     is a little longer than I normally would, but it is a holiday

13     and summertime.

14          MS. SCHULMAN:  I'm feeling generous, so yes.

15          THE COURT:  To your credit.  July 9th.  I'll issue an

16     order memorializing that.  Is there anything else that I should

17     be aware of or anything else going on in this case, any

18     prospects for settlement or any other moving parts that might

19     obviate the need for this motion?  No.  This is the whole

20     ballgame.

21          Sometimes you wonder whether it is worth spending this

22     kind of time and energy on deciding whether it is going to be

23     an arbitrator or the Court.  But I think probably the class

24     provision is important for determining the value of the case.

25     Let's do that.  I'll issue an order to that effect and then we

1   will see where we are.

2          Thank you.  Good to see you all.  Have a nice day.

3   Let me thank the court reporter.  If anyone needs a copy of

4   this transcript you can take it up with the Court reporter, but

5   not now because I'm running late on a criminal matter and have

6   been keeping people waiting.  Thanks.

7          (Adjourned)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25